# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SAMUEL M. BECKER,

        Petitioner,

v.

                                         Case No. 15-3036-JTM

SAM CLINE, ET AL.,

        Respondents.

## MEMORANDUM AND ORDER DENYING HABEAS PETITION

This matter comes before the court on Samuel M. Becker's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (Dkt. 1), Respondents' Answer and Return (Dkt. 10), and the relevant state court records (Dkt. 12). Becker, through counsel, alleges numerous grounds for relief, including ineffective assistance of counsel, a jury instruction error, and prosecutor misconduct. For the reasons set forth below, the court concludes that Becker is not entitled to federal habeas corpus relief and denies the petition.

## I.  Federal Habeas Standards

### A.  Generally

A federal court reviews a state prisoner's challenge to matters decided in state court proceedings pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which "requires federal courts to give significant deference to state court decisions" on the merits. *Lockett v. Trammel*, 711 F.3d 1218, 1230 (10th Cir. 2013). A federal court may not grant a state prisoner habeas relief with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the prisoner can show that the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Clearly established law refers to the Supreme Court's holdings, as opposed to its dicta. *Lockett*, 711 F.3d at 1231. A state court decision is "contrary to" the Supreme Court's clearly established precedent "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (quotations omitted). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).

### B.   Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a petitioner must show both that his counsel's performance "fell below an objective standard of reasonableness" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Failure under either prong is dispositive. *Id.* at 697. In reviewing counsel's performance, courts presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011). "To be deficient, the performance must be outside the wide range of professionally competent assistance. In other words, it must have been completely unreasonable, not merely wrong." *Id.* (internal quotations and citations omitted). Petitioner bears a heavy burden of overcoming the presumption that counsel's actions were sound trial strategy. *Id.* This burden increases doubly at the § 2254 proceeding level as federal courts defer not only to the attorney's

decision in how to best represent a client, but also to the state court's determination that counsel's performance was not deficient. *Id.*

## II.      Factual and Procedural History

The court presumes the state court's factual determinations are correct, unless the petitioner rebuts the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Becker has not proffered any evidence in support of that burden. Thus, the court adopts the following facts as taken from the Kansas Supreme Court's ("KSC") opinion affirming his conviction.

> On January 29, 2007, Edward Gordon discovered that someone had broken into his house in Baxter Springs and stolen a safe in which he kept money and a supply of drugs that he kept for sale. He called Geoffrey Haynes, who gave Gordon and Gordon's girlfriend, Chandra Dupree, a ride to Pittsburg. There they met Aaron Graham and the defendant Becker.

> Gordon, Graham, and Becker discussed how to determine who had stolen the safe and how to retrieve it. The three picked up a handgun at Graham's father's house and then drove to the home of George Rantz in Riverton. When Rantz answered the door, the three forced their way into the house. They proceeded to interrogate him about the missing safe, during which Graham waved the gun in the air and Becker suggested that someone was going to pay for the theft with his life. Rantz told them he did not know about the safe, and Becker urged Gordon and Graham to "shoot the motherfucker" to make an example out of him. Rantz's girlfriend, Haley Watkins, said she was going to call the police, and the three intruders became calmer. Rantz then said he would go with them to find the thief, and they all went back to Haynes's car and proceeded to the home of Drew Thiele.

> Gordon, Graham, and Becker forced their way into Thiele's·house and began questioning him about the contents of the safe and where he had been that night. During this questioning, Becker hit Thiele in the face with his fist. They then knocked Thiele down, and Becker beat him while Gordon pointed the gun at him. During the beating, Becker shoved his thumb into Thiele's eye and choked him. They finally left Thiele on the floor, telling him not to call the police and that he should have the drugs and money available at 5 a.m. or they would kill him.

> They dropped Dupree off and made several other stops before driving to Gordon's house. All five men-Gordon, Graham, Becker, Haynes, and Rantz-went inside. Dupree showed up a short time later because she had forgotten her cell

3

phone. Gordon then called Brad Ashe and asked him to come to his house. Ashe and his girlfriend, Natalie Stephens, came into the house, where Graham approached Stephens, demanding to know who she was and telling her to leave.

Inside the house, Graham and Becker shouted at and threatened Ashe and waved the gun around. They forced him to sit on the couch and asked him questions about the missing safe. After Ashe denied any knowledge about it, Becker began to punch him and hit him with his knee. Stephens returned to the house and sat behind the couch while the men beat and questioned Ashe. At one point, Graham put the gun in Ashe's mouth and threatened to shoot him.

Dupree attempted to leave the house, but Graham stopped her, telling her that she was "not fucking going anywhere" and that she had to go to the back bedroom, which she did out of fear for her safety. Graham then discovered Stephens behind the couch and directed her to sit next to Ashe on the couch. Graham held the gun to her head and asked Ashe whether Stephens's life was worth five thousand dollars.

Gordon, Graham, and Becker then sent Haynes, Rantz, and Stephens to the back bedroom with Dupree, and they complied because they were afraid and thought they had no reasonable choice in the matter. The three men continued to beat and question Ashe, who mentioned the name of J-Rich, a nickname for Jamey Richardson.

While subjecting Ashe to the interrogation and beatings, Gordon and Graham went back and forth between the living room, where Ashe was located and the bedroom, where Dupree, Rantz, Haynes, and Stephens were located, while Becker stayed with Ashe. They threatened their captives with the gun and told them that they would shoot anyone who tried to leave the room. When Gordon and Graham went to take the cell phones from the people in the bedroom, Becker wielded two hacksaws at Ashe and asked him, "Do you know what kind of sick motherfucker I am?"

Around that time, Jamey Richardson arrived at the front door, apparently in response to a call from Gordon. Gordon and Graham let him into the house, and Graham pointed the gun at him. The three men directed him to sit on the couch, where they ordered him to tell them where the missing safe and its contents were. Graham pointed the gun at Richardson, who attempted to knock it away. Richardson then grabbed the barrel of the gun and forced it up toward the ceiling as he tried to stand up. Gordon, Graham, and Becker acted in concert to physically force him back onto the couch.

Richardson then suggested that they all go talk to someone else and again got up from the couch. He got as far as the front door, although Graham continued to train the gun on him and Graham attempted to block his path. Richardson went outside, and Gordon, Graham, and Becker followed him.

Ashe, who remained in the house, heard people yelling outside, followed by a gunshot. He heard someone say, "I shot your boy," and then Gordon returned to the house, ran through the house, and then ran back outside. A few seconds later he heard a second gunshot. Gordon, Graham, and Becker came back inside and told everyone to leave the house. Everyone ran from the house, during which time Rantz and Haynes saw Becker holding the gun.

As they ran from the house, Richardson screamed for help, but no one stopped to give him aid. A bullet had struck him in the leg, severing two arteries and causing him to bleed to death shortly after he was shot. At around 2 a.m., police, responding to calls from neighbors, found Richardson dead in the driver's seat of his car.

The following day, Becker admitted to Graham's mother that he had shot Richardson. He told her that Richardson had somehow taken the gun, which fired, and Richardson said he had "shot your boy." The gun then somehow fell to the ground, and Becker, fearing that Graham had been shot and that he himself would be shot next, picked up the gun and shot Richardson in self-defense.

Becker was eventually charged with a number of felonies: one count of aggravated burglary for entering a structure with the intent to commit aggravated assault against George Rantz and/or Haley Watkins; one count of aggravated assault against George Rantz; one count of kidnapping of George Rantz with the intent to injure or terrorize Rantz or Ashe or Richardson; one count of aggravated burglary for entering a structure with the intent to commit aggravated assault against Joseph Thiele; one count of aggravated battery against Thiele; one count of aggravated battery against Ashe; one count of aggravated assault against Natalie Stephens; one count of kidnapping of Natalie Stephens with the intent to injure or terrorize Stephens or Ashe or Richardson; one count of kidnapping of Chandra Dupree with the intent to injure or terrorize Dupree or Ashe or Richardson; one count of kidnapping of Richardson with the intent to injure or terrorize Richardson; one count of kidnapping of Ashe with the intent to injure or terrorize Ashe; and one count of first degree felony murder for the death of Richardson while Becker was kidnapping Stephens and/or Dupree and/or Richardson.

A jury found Becker not guilty of the first count-aggravated burglary of the residence of Rantz and/or Watkins. The jury found him guilty of the lesser offense of attempted kidnapping of Richardson and guilty of every other count as charged. The district court sentenced him to an aggregate term of life plus 68 months.

*State v. Becker*, 290 Kan. 842, 842-46 (2010).

Becker appealed his convictions, raising the following issues: 1) the trial court erred in admitting hearsay evidence; 2) the prosecutor committed misconduct by diluting the burden of proof; 3) insufficient evidence supports the kidnapping and felony murder convictions; and 4) the trial court erred in failing to give a unanimity instruction. On July 9, 2010, the Kansas Supreme Court affirmed the convictions. *Id.*

On June 21, 2011, Becker filed a motion for post-conviction relief under Kan. Stat. Ann. § 60-1507 in the District Court of Cherokee County, Kansas (the "1507 Motion"). On August 22, 2012, that court denied the motion. The Kansas Court of Appeals ("KCOA") affirmed that decision on April 25, 2014, and the KSC denied review. *Becker v. State*, No. 108,776, 2014 WL 1707435, 322 P.3d 1027 (Kan. Ct. App. 2014), review denied (Feb. 19, 2015).

On February 23, 2015, Becker filed this habeas petition, alleging nine grounds for relief. Respondents urge denial of habeas relief because Becker cannot demonstrate any constitutional errors or that the state court decisions failed to comport with clearly established federal law.

III.    **Analysis**

Because both parties recite the state court decisions at length, the court will not repeat them except as necessary to the analysis. The court divides the nine grounds into four categories: A) ineffective assistance of counsel, B) jury instruction, C) hearsay, and D) prosecutorial misconduct.

A.   **Ineffective Assistance of Counsel (Ground 1-6)**

Becker alleges his trial counsel, Michael Gayoso, provided ineffective assistance six different ways. The KCOA rejected all six claims, finding Gayoso's performance was not deficient in any alleged instance. Becker now argues that the KCOA's decision was based on an

unreasonable determination of the facts in light of the evidence presented and an unreasonable application of *Strickland.*

### 1.        Failing to Request a Trial Continuance (Ground 1)

Becker maintains Gayoso was ineffective for failing to request a trial continuance to investigate and decide whether to pursue a self-defense claim based on Lori Graham's proffered testimony three days before trial that Becker confessed to being the shooter to her. He argued that had Gayoso explained things properly, he would have agreed to the continuance. The KCOA concluded that: 1) Gayoso properly informed the court, in Becker's presence, of the problems Graham's new statement presented to Becker's defense; 2) Gayoso secured an opportunity for Becker to obtain a continuance but Becker refused; 3) Becker's decision to proceed to trial was made knowingly; and 4) Gayoso's performance with respect to his failure to obtain a continuance did not fall outside the wide range of objectively reasonable performance. *Becker*, 2014 WL 1707435 at *4-5.

Becker now argues that the KCOA overlooked his testimony that he would have agreed to waive his right to speedy trial had Gayoso made it clear that a continuance would have made a difference. Dkt. 2 at 14.[1] The KCOA, however, did not overlook Becker's testimony. The KCOA concluded that "[t]he record did not support Becker's version of the events." *Becker*, 2014 WL 1707435 at *4. In other words, the KCOA found his testimony not credible. Becker was present when Gayoso explained to the trial court the need for a continuance to investigate and develop a self-defense claim. *Id.* at *5. Despite this, Becker refused to waive his speedy trial right and agree to a continuance. The court finds the record supports the KCOA's conclusion that Gayoso's performance with respect to failing to obtain a continuance was not deficient. Gayoso

---

[1] Becker also argues that the KCOA overlooked the fact that Gayoso failed to revisit with him whether he should testify given Graham's newly proffered testimony. The court will address that argument in Section III.A.5.

did not fail to request a continuance. He argued for one and secured an opportunity for Becker to obtain a continuance, but Becker decided otherwise.

As to Becker's claim that appellate counsel was ineffective for failing to raise this issue on direct appeal, the court agrees with the KCOA that if trial counsel's performance was not ineffective regarding a particular issue, then "it necessarily follows that [] appellate counsel was not ineffective for failing to raise that issue on direct appeal." *Becker*, 2014 WL 1707435 at *5. In sum, Ground 1 provides no basis for habeas relief.

**2.      Failing to Investigate and Pursue a Proximate Cause Defense (Ground 2)**

Becker maintains that Gayoso was ineffective for failing to investigate and pursue a defense theory that Becker's conduct was not the proximate cause of Richardson's death, but instead, was due to the lack of timely medical intervention. The KCOA concluded that "Gayoso's decision not to pursue a proximate cause of death argument was a trial strategy arrived at after sufficient investigation." *Id.* at *7. Becker argues the KCOA overlooked the fact that Gayoso decided that the proximate cause defense was not a viable one without having all the facts available. Dkt. 2 at 22. Most importantly, he argues, Gayoso did not find out how long it would take a person to bleed out under the circumstances, did not subpoena expert witnesses to testify on the issue, and did not request an independent autopsy. Becker also claims the KCOA overlooked evidence he presented that suggested the loss of blood could have been prevented with timely medical intervention. *Id.* at 32.

The court finds these arguments unavailing. First, although Becker claims that he presented evidence to suggest that the loss of blood could have been prevented with timely medical intervention, he fails to cite to any evidence in the state court record to support this contention. Second, Becker focuses on what Gayoso failed to do, instead of what he did. Gayoso

testified that he reviewed the information he had (the medical and incident reports), spoke with the coroner for approximately an hour on the phone (R. 3 at 13:12-15), and researched the proximate cause issue. The KCOA found this was sufficient under the circumstances. As far as the court can discern, the only evidence that supports Becker's claim of deficient performance was the testimony of two experienced defense attorneys who said it was not reasonable for a defense attorney to only read the police reports and not investigate further or conduct interviews. However, because competent lawyers might disagree on what the best trial tactic or strategy would have been, the KCOA did not err when it deferred to Gayoso's decision. The court finds the record supports the KCOA's determination that Gayoso's performance did not fall below an objective standard of reasonableness and that the KCOA reasonably applied the *Strickland* standard in making that determination.

### 3.        Failing to Investigate Lack of Mental State Defense (Ground 3)

Becker maintains that Gayoso was ineffective for failing to investigate and pursue a defense that he did not have the requisite mental state to commit the charged crimes because he suffered from post-traumatic stress disorder (PTSD) after enduring years of sexual abuse in his early teens. He claims that Gayoso knew that he had been diagnosed with PTSD, yet Gayoso did not: 1) consult with a mental health professional to determine whether Becker still had PTSD and whether it provided a basis for a mental defect defense, 2) obtain an independent mental health evaluation of Becker, or 3) conduct any research on PTSD. Dkt. 2 at 35. Instead, Gayoso decided a PTSD-based defense was not viable after conversing with and personally assessing Becker's affect and demeanor. Defense attorneys Christopher Meeks and Edward J. Battitori, however, testified that this was unreasonable and not the standard practice in these circumstances. *Id.* at 44.

9

Once again, Becker focuses on what Gayoso failed to do, rather than what he did. Gayoso spoke to the attorney who handled the civil suit about the sexual abuse and the criminal case. R. 3 at 21-22. He also spoke to Becker at length, who indicated no disassociative thoughts, blackouts, post-traumatic occurrences, or psychological trauma during the crimes. Additionally, Gayoso testified that Becker was not amenable to raising his PTSD out in open court. *Id.* at 144. Under these circumstances, the court finds the record supports the KCOA's conclusion that Gayoso's decision not to pursue a mental state defense was a trial strategy arrived at after sufficient investigation. The KCOA did not err when it deferred to Gayoso's trial strategy regarding this issue.

### 4.        Failing to Request a Change of Venue (Ground 4)

Regarding his claim that trial counsel was ineffective for failing to request a change of venue, Becker argues that the KCOA's decision was an unreasonable determination of the facts and an unreasonable application of federal law. The court disagrees. To establish ineffective assistance for failure to move for a change of venue due to prejudicial pretrial publicity, a defendant must show, at a minimum, that: 1) the trial court would have granted a change of venue motion, and 2) actual or presumed prejudice on the part of jurors. *Tafoya v. Tansy*, 9 F. App'x 862, 871-72 (10th Cir. 2001). Actual prejudice requires showing that one or more jurors believed before trial that petitioner was guilty and that they could not set these pre-formed opinions aside at trial. *Hale v. Gibson*, 227 F.3d 1298, 1332 (10th Cir. 2000). Presumed prejudice requires showing that "an irrepressibly hostile attitude pervaded the community." *Id.*

During jury selection, the trial court excused some potential jurors because they indicated they could not set aside their biases. This indicates voir dire was effective. Thus, the record supports the KCOA's findings that: 1) Becker failed to produce any evidence that a motion to

change venue could have succeeded; 2) Becker cannot point to any evidence that a particular juror was prejudiced or that a potential juror actually made a comment that could have tainted other jurors; and 3) counsel's decision to rely on jury questionnaires and voir dire (rather than community polling) to ferret out juror bias was not an unreasonable trial strategy, *Becker*, 2014 WL 1707435 at *8. Additionally, the KCOA's conclusion that pretrial publicity, by itself, is insufficient to establish prejudice justifying a change in venue is consistent with federal law. *See Skilling v. United States*, 561 U.S. 358, 384 (2010) (pretrial publicity, even pervasive, adverse publicity, does not inevitably lead to an unfair trial for purpose of choosing venue). For these reasons, Ground 4 fails as a basis for federal habeas relief.

### 5.    Failing to Prepare Becker to Testify to Self-Defense (Ground 5)

Becker maintains Gayoso was ineffective for: 1) failing to prepare him to testify in pursuit of a self-defense claim, 2) inadequately advising him of his right to testify, 3) failing to revisit with him whether he should testify after Graham changed her testimony, and 4) denying him his right to testify. Dkt. 2 at 63. He claims that Gayoso never explained that he had a right to testify even over counsel's objection. *Id.* at 56, 58, and 59. He argues that the lack of inquiry by the trial court into whether he voluntarily waived his right to testify supports his claim that he did not knowingly waive his right to testify. *Id.* at 56-57. He also says the KCOA overlooked the fact that he wanted to testify. *Id.* at 55, 59.

These arguments lack merit. First, when asked about his understanding of his right to testify, Becker answered: "I mean, I can do it if I want. There are a lot of things I could do but it wasn't beneficial. He advised me not to." R. 3 at 141:19-21. This testimony indicates Becker knew he could testify against counsel's advice. Additionally, Becker's refusal to waive his right to speedy trial shows he did not always follow counsel's advice. Second, "[t]he trial court has no

duty to advise the defendant of his right to testify, nor is the court required to ensure that an on-the-record waiver has occurred. Rather, if the defendant wants to testify, he can reject his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer." *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir.), *cert. denied*, 510 U.S. 1019 (1993) (internal quotes and citations omitted); *United States v. Martinez*, 883 F.2d 750, 760 (9th Cir. 1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir.), cert. denied, 501 U.S. 1249 (1991) ("All circuit courts reaching the question have held that courts have no affirmative duty sua sponte to address a silent defendant and inquire whether he knowingly and intelligently waives the right to testify."); *Taylor v. State*, 252 Kan. 98, 106 (1992) (trial court does not have a duty sua sponte to inquire whether defendant knowingly waives right to trial because there is a danger that by asking a defendant if he is aware of his right to testify, a trial court may inadvertently influence a defendant to waive the equally fundamental right against self-incrimination.). Third, Becker's desire to testify is irrelevant to whether Gayoso's recommendation not to testify was objectively reasonable. Defendants often want to testify, but do not because it opens them to cross-examination. Fourth, because Graham's newly proffered testimony did not change Gayoso's recommendation regarding testifying, revisiting that issue was not necessary. The court finds the record supports the KCOA's conclusion that Gayoso did not prevent Becker from testifying and that Becker was not denied the right to testify.

### 6.      Counsel's Experience and Qualifications (Ground 6)

Becker claims Gayoso was not qualified to handle his case and had insufficient experience pursuant to K.A.R. 105-3-2(a)(3). The KCOA rejected this argument because that regulation governs court-appointed attorneys, not retained counsel such as Gayoso. More importantly, because all of Becker's specific claims of ineffectiveness failed, the KCOA

concluded that the catch-all claim based on alleged lack of experience must also fail. The court

finds the KCOA's analysis of this issue succinct, well-reasoned, and consistent with federal law.

*United States v. Cronic*, 466 U.S. 648, 666 (1984) ("[Defendant] can . . . make out a claim of

ineffective assistance only by pointing to specific errors made by trial counsel."). Thus, Ground

6 fails as a basis for federal habeas relief.

### B.   Unanimity Instruction and Sufficiency of Evidence (Ground 7)

Becker next contends that he is entitled to habeas relief based on the trial court's failure

to give a unanimity instruction, which allowed the jury to convict him of felony murder based on

three alternative underlying felonies (the kidnapping of Stephens, Dupree, and/or Richardson),

without requiring the jury to specify which felony it relied upon. The KSC rejected this claim,

finding no error in the failure to give a specific unanimity instruction. The KSC held that, "[i]n

an alternative means case [rather than a multiple acts case], the jury must be unanimous as to

guilt for the single crime charged, but need not be unanimous as to the particular means by which

the crime was committed, so long as substantial evidence supports each alternative means."

*Becker*, 290 Kan. at 855 (*citing State v. Wright*, 290 Kan. 194, 201-02 (2010)).

The KSC also rejected Becker's argument that insufficient evidence supported his

kidnapping convictions with the following analysis:

> This was not a case in which the defendant was sitting passively in the car waiting
> to drive the other perpetrators away; Becker was actively and violently engaged in
> the same enterprises as Gordon and Graham. When the three went to the home of
> Rantz and Watkins, all three forced their way into the house, all three engaged in
> threatening Rantz, and Becker urged Graham to shoot Rantz. At Gordon's house,
> Rantz, Dupree, and Stephens were all sent to a back bedroom by Gordon,
> Graham, and Becker. There was abundant testimony that all three of the men took
> part in beating and threatening Ashe and forcing him to stay on the couch. There
> was also abundant testimony that Becker stood guard over Ashe while Gordon
> and Graham went to the bedroom, threatened the captives there with the gun, and
> took their cell phones. A jury could easily conclude that Becker acted in concert
> with Gordon and Graham to carry out the kidnapping of Dupree, Stephens, and

> Richardson. In fact, it would have taken a remarkable leap of logic for a jury to
> conclude that Becker did not intend to participate fully in all of the criminal acts,
> up to and including the shooting.

*Becker*, 290 Kan. at 852-53. The applicable constitutional standard for a sufficiency of evidence claim is whether considering the evidence produced at trial, any rational trier of fact could have found petitioner guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Supreme Court in *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 132 S.Ct. 2, 3-4 (2011). To obtain federal habeas relief, it must be shown that a state court decision rejecting a sufficiency of the evidence claim was objectively unreasonable. *Id.* at 4. The court finds the KSC applied a legal standard consistent with *Jackson*, and applied it in an objectively reasonable manner.

And because there was sufficient evidence supporting each of the alternative kidnappings, the court finds the KSC's rejection of the unanimity argument consistent with the Supreme Court's decision in *Schad v. Arizona*, 501 U.S. 624 (1991), which held that due process does not require unanimity from a state court jury on the various means or theories of committing a single offense charged. Accordingly, Ground 7 provides no basis for habeas relief.

### C.  Hearsay (Ground 8)

Becker argues that the trial court erred in finding statements made by co-defendant Edward Gordon, through the testimony of other witnesses, admissible under the co-conspirator exception to the hearsay rule pursuant to Kan. Stat. Ann. § 60-460(I)(2). He claims that the admission of these statements, without Gordon testifying, violated his Sixth Amendment right to confrontation and was contrary to or an unreasonable application of *Crawford v. Washington*, 541 U.S. 36 (2004). The KSC rejected this argument after determining that these statements did

14

not constitute hearsay because: 1) they were threats or directives, which were not presented to prove the truth of the assertions, 2) they were offered as explanations for why the people who heard them responded as they did, 3) they were made in the course of criminal activity, not in the course of subsequent investigation, and 4) they were not testimonial. *Becker*, 290 Kan. at 846-49. The KSC ultimately concluded that the admission of these statements did not violate the Confrontation Clause. The court finds the KSC's analysis comports with federal law.

Because the KSC resolved the Confrontation Clause question based on whether the statements were testimonial in nature, the court need not discuss whether the statements were admissible as co-conspirator hearsay. The Confrontation Clause bars the introduction of testimonial hearsay against a criminal defendant, unless the declarant is unavailable and the accused has had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-54. Here, the challenged statements were clearly not testimonial. Because none of the statements Becker complains of qualify as testimonial hearsay offered against him under *Crawford*, the KSC's determination on this issue was not legally or factually unreasonable. Thus, Ground 8 fails as a basis for habeas relief.

**D. Prosecutor Misconduct (Ground 9)**

Becker alleges that the prosecutor's statements during voir dire and closing argument relieved the State of its burden to prove intent to commit the underlying felonies (kidnapping), which denied him a fair trial.[2] Becker argues the prosecutor's voir dire statement that the jury did not have to find Becker and his cohorts intended to kill Richardson, but only that Richardson was killed during the course of their committing a felony was an incorrect statement of the law. The

---

[2] Becker took issue with the following comments: "in for a penny, in for a pound," "you can't be a little bit pregnant," "if you're a part of the team, you own as much of this trophy as anybody else," "if you're an aider and abettor, you can't be a little bit involved," and "if you're involved in the kidnapping, you're guilty of felony murder."

KSC disagreed and found this statement accurately stated the general nature of the case because there was no requirement that a prosecutor must set out every element of every charged crime during voir dire. *Becker*, 290 Kan. at 850. As for the prosecutor's comments on aiding and abetting, the KSC found that they were not improper when:

> read in conjunction with the closing argument as a whole, which asserted the need to find intent on Becker's part, and in light of the evidence as a whole, which showed that Becker behaved much like a principal and engaged in conduct from which it could easily be inferred that he intended the elements of the crimes charged.

*Id.* at 851.

A prosecutor's improper comments violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). *See also Darden v. Wainwright*, 477 U.S. 168, 179-81 (1986) (quoting *Donnelly* and noting that it is helpful to place remarks in context); *Parker v. Matthews*, —— U.S. ——, 132 S.Ct. 2148, 2153 (2012) (identifying *Darden* as "clearly established Federal law" on prosecutorial misconduct). A proceeding is fundamentally unfair under the Due Process Clause if it is "shocking to the universal sense of justice." *United States v. Russell*, 411 U.S. 423, 432 (1973). In making this determination, the court must examine the prosecutor's statements in context by looking "first at the strength of the evidence against the defendant and decid[ing] whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution." *Fero v. Kerby*, 39 F.3d 1462, 1474 (10th Cir. 1994) (quotations omitted).

Here, the KSC, in deciding whether the prosecutor's statements denied Becker a fair trial, applied the same test required by the United States Supreme Court in *Donnelly* and *Darden*. The KSC viewed the prosecutor's statements in context and weighed them against the strength of the

evidence against the defendant. While the challenged comments may suggest that intent to commit the crimes was not essential to proving guilt as an aider and abetter, the prosecutor made numerous statements indicating that intent was an essential element:

> So each time you go to a different count you have to ask yourself did he aid and abet.

> When you aid and abet you have to aid and abet with the intent to promote or assist in the commission of the crime.

> It doesn't matter if he was terrorized. What matters is if they intended to terrorize him. That was the whole plan; get these people over here, threaten them and find out where the safe is. So was there intent to terrorize him?

Because the KSC's rejection of this claim was not contrary to, or an unreasonable application of, clearly-established Supreme Court jurisprudence, the court finds Becker is not entitled to habeas relief with respect to this claim.

## IV.    Evidentiary Hearing

The court finds no need for an evidentiary hearing. *Anderson v. Attorney Gen. of Kansas*, 425 F.3d 853, 859 (10th Cir. 2005) ("[A]n evidentiary hearing is unnecessary if the claim can be resolved on the record."); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

## V.    Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." "A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy this standard, the movant must demonstrate that "'reasonable jurists would find the district court's assessment of

the constitutional claims debatable or wrong.'" *Saiz v. Ortiz*, 392 F.3d 1166, 1171 n. 3 (10th Cir. 2004) (*quoting Tennard v. Dretke*, 542 U.S. 274, 282 (2004)). While a movant is not required to demonstrate that his appeal will succeed to be entitled to a COA, he must "prove something more than the absence of frivolity or the existence of mere good faith." *Miller–El v. Cockrell*, 537 U.S. 322, 338 (2003) (quotation omitted). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *Id.* at 336. The rulings made above are not the type that reasonable jurists could debate or would conclude were wrong. Therefore, the court declines to issue a certificate of appealabilty for this Order.

**IT IS THEREFORE ORDERED** that Becker's petition for habeas corpus relief (Dkt. 1) is **DENIED**.

**IT IS SO ORDERED** this 4th day of August 2016.

s/ J. Thomas Marten
J. THOMAS MARTEN, Judge

18